UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VANESSA ADAMS, legal name Nicholas Adams )<br>)<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>FEDERAL BUREAU OF PRISONS; FEDERAL )<br>BUREAU OF PRISONS DIRECTOR HARLEY G. )<br>LAPPIN, in his official capacity; REAR ADMIRAL )<br>NEWTON E. KENDIG, MD, in his official capacity, , )<br>)<br>Defendants ) | CIVIL ACTION<br>NO. 09-10272 JLT |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Vanessa Adams, legal name Nicholas Adams ("Plaintiff" or "Ms. Adams"),[1] by counsel, brings this action to obtain redress for the deprivation of her federal constitutional rights, as hereinafter alleged.

### INTRODUCTION

1. Plaintiff is currently a prisoner serving her sentence at a facility operated by the Federal Bureau of Prisons ("BOP").

2. Plaintiff was diagnosed with Gender Identity Disorder (referred to herein as "Gender Identity Disorder" or "GID") in 2005 by medical professionals at the United States Medical Center for Federal Prisoners ("USMCFP") in Springfield, Missouri.

3. Gender Identity Disorder is a serious medical condition that requires medical care, and that causes the individual with GID significant distress in social, occupational, or other important areas of function. People with GID typically have strong cross-gender identification, meaning a belief that one is the opposite sex, and a persistent anxiety and discomfort concerning their assigned sex.

---

[1] Although Plaintiff was born a biological male, she identifies as female, goes by "Vanessa," and intends to change her legal name to "Vanessa Adams." Accordingly, throughout this pleading, she will be referred to by the feminine pronoun and salutation except that Plaintiff has not changed pronouns in quoted statements from BOP documents.

4. Beginning over four (4) years ago, in approximately February 2005, Ms. Adams has sought treatment for her GID. Despite the BOP's diagnosis of Ms. Adams' GID, and Defendants' knowledge that Ms. Adams has caused serious harm to herself on multiple occasions due to her untreated condition, Defendants have refused, and continue to refuse, to provide appropriate medical care to Plaintiff.

5. As a direct result of Defendants' refusals and deliberate indifference to her serious GID condition, Ms. Adams has attempted to commit suicide multiple times, has attempted to remove her penis or testicles with a razor on at least two occasions, and has ultimately severed her own penis. Nevertheless, Defendants continue to refuse to provide necessary medical care to Ms. Adams, including, but not limited to, refusing to provide her with specific psychological treatment, hormone therapy, and other medical treatments deemed appropriate by medical professionals with experience in the treatment of GID.

6. In support of their refusal to provide necessary medical care for Plaintiff, BOP officials and staff have referred to a BOP policy which prevents prisoners with Gender Identity Disorder from receiving individualized medical assessments and treatment for this serious medical condition.

7. Ms. Adams by this action challenges Defendants' refusal to provide medical care as an unconstitutional deprivation in violation of the Eighth Amendment of the United States Constitution.

8. Ms. Adams challenges the constitutionality of this policy both on its face and as applied to her as a violation of the Eighth Amendment of the United States Constitution.

9. Ms. Adams seeks declaratory and injunctive relief, including appropriate treatment and counseling by competent professionals experienced in treating persons with GID, to continue throughout her incarceration.

## JURISDICTION

10. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that it is a civil action arising under the Constitution and laws of the United States and is premised upon the acts or omissions of defendants acting under color of federal law.

11. Jurisdiction in this Court is proper for the Plaintiff's claim for declaratory and injunctive relief against Defendants Federal Bureau of Prisons, Director Harley G. Lappin, and Assistant Director Health Services Dr. Newton E. Kendig in their official capacities pursuant to 5 U.S.C. § 702.

12. This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

13. Venue in the District of Massachusetts is proper pursuant to 28 U.S.C. § 1391(e).

14. All Defendants are agencies, officers, or employees of the United States of America, or were at the time of the incidents at issue.

## PARTIES

15. Plaintiff VANESSA ADAMS, at all times material to this action, has been a federal prisoner in the custody and control of the BOP. She is currently housed at the USMCFP in Springfield, Missouri. She was previously housed at other BOP institutions, including the Federal Medical Center Devens in Ayer, Massachusetts.

16. Defendant BOP is the United States agency that currently and at all times relevant to this Complaint, has custody and control of Plaintiff Adams.

17. Defendant, HARLEY G. LAPPIN, ("LAPPIN"), is currently and has been Director of the BOP at all times relevant to this claim. He is sued in his official capacity.

18. Defendant, REAR ADMIRAL NEWTON E. KENDIG, MD ("KENDIG"), is currently Assistant Director, Health Services Division and Medical Director of the BOP. He has been Medical Director of the BOP since 1999, and Assistant Director, Health Services Division, since August 2006. He is responsible for the provision of health services at all BOP facilities. He is sued in his official capacity.

19. There is an actual controversy between and among the parties.

**OVERVIEW OF MS. ADAMS' PLACEMENT HISTORY WITHIN THE BOP**

20. Ms. Adams was received by the BOP in 1999, to the Federal Correctional Institution ("FCI") Tucson, Arizona. Since 1999, Ms. Adams has been imprisoned in at least seven different BOP facilities in seven states. She is currently serving a 248-month sentence in the BOP, with a projected release date in 2017.

21. The emotional and physical consequences of identifying as female while being physiologically male have intensified severely during Ms. Adams' incarceration within the BOP, resulting in several suicide attempts and eventually leading to her GID diagnosis. On September 29, 2002, at FCI Victorville, California, Ms. Adams attempted suicide by hanging herself. On July 8, 2003, Ms. Adams attempted suicide by cutting her wrists. Following this attempt, she remained on suicide watch for over a month, and was ultimately transferred to the USMCFP Springfield, Missouri, for a psychiatric evaluation. She was returned to FCI Tucson in February 2004. On May 9, 2004, at FCI Tucson, Ms. Adams admitted to planning to commit suicide by taking deliberate action that would lead correctional officers to shoot her (colloquially known as "death by cop"). As a result of this attempt, Ms. Adams was sanctioned to 30 days disciplinary segregation and transferred to the Axis II residential treatment program at USMCFP Springfield to address her suicidality and chronic depression.

22. As a result of BOP's failure to treat Ms. Adams, she made her first attempt to cut off her testicles at USMCFP Springfield in July 2005. Shortly thereafter, Ms. Adams was transferred to the Federal Medical Center ("FMC") Devens in Massachusetts for inpatient mental health treatment. In March 2006, she was transferred to United States Penitentiary ("USP") Beaumont in Texas where she was held until December 2006. While at USP Beaumont, in August 2006, Ms. Adams attempted to cut her penis off. In December 2006, she was sent to the Federal Transfer Center in Oklahoma before being transferred on January 4, 2007 to USP-I Coleman in Florida.

23. Because of BOP's failure to provide Ms. Adams with treatment for her GID, Ms. Adams successfully severed her penis in February 2009 at USP-I Coleman. Ms. Adams was then transferred to the USMCFP in Springfield, Missouri, where she is currently incarcerated.

## GID IS A SERIOUS MEDICAL CONDITION THAT REQUIRES ADEQUATE MEDICAL TREATMENT

24. As discussed more fully below, Ms. Adams was diagnosed with GID in 2005 by mental health providers employed by Defendant BOP.

25. GID is a recognized diagnosable and treatable medical condition listed in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR). Diagnosis is based on the following criteria: (1) a strong cross-gender identification, which is the desire to be, or the insistence that one is, the other sex; (2) a persistent discomfort with one's assigned sex or an inappropriateness in the gender role of that sex; (3) the disturbance is not concurrent with a physical intersex condition (e.g. a person who is born with ambiguous genitalia); and (4) the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

26. The World Health Organization also recognizes the discordance between anatomical sex and gender as a disorder in its 1990 publication, *The International Classification of Diseases* (known as ICD-10), but uses the nomenclature of transsexualism.

27. The World Professional Association for Transgender Health (WPATH) is an international professional association of physicians and other health care professionals who specialize in treating GID. WPATH promotes understanding and treatment of gender identity disorders. WPATH publishes the internationally accepted *Standards of Care for the Treatment of Gender Identity Disorders* (*Standards of Care*).

28. The *Standards of Care* are guidelines for care and treatment of people with GID.

29. The goal of medical treatments for GID according to the *Standards of Care* is: (1) to alleviate the clinically significant distress and impairment of functioning associated with GID, and (2) to achieve lasting personal comfort with the gendered self in order to maximize overall psychological well-being and self-fulfillment.

30. The *Standards of Care* provide that there are three medically appropriate treatment options to treat GID: (1) hormones of the desired gender; (2) the "real-life experience," i.e. living full-time in the new gender, as a prerequisite to surgery; and (3) surgery to change the sex characteristics of the person suffering from GID. These treatment options are frequently referred to as triadic therapy. Triadic therapy is recognized throughout the medical community as the accepted and appropriate treatment for GID.

31. According to the *Standards of Care* and the DSM-IV-TR, people with GID who do not receive appropriate medical treatment are at risk of genital self-harm (a form of surgical self-treatment through auto-castration or auto-penectomy that can lead to serious, even life threatening, injuries), depression, anxiety, and suicide attempts.

**DEFENDANTS BOP, LAPPIN, AND KENDIG PROMULGATED AND ENFORCE A POLICY THAT DENIES PRISONERS WITH GENDER IDENTITY DISORDER, INCLUDING MS. ADAMS, INDIVIDUALIZED EVALUATION AND CONSTITUTIONALY ADEQUATE TREATMENT**

32. BOP Program Statement P6031.01(30) provides that "Inmates who have undergone treatment for gender identity disorder will be maintained only at the level of change which existed when they were incarcerated in the Bureau. Such inmates will receive thorough medical and mental health evaluations, including the review of all available outside records. The Medical Director will be consulted prior to continuing or implementing such treatment. The Medical Director must approve, in writing, hormone use for the maintenance of secondary sexual characteristics in writing."

33. Defendants BOP, LAPPIN, and KENDIG are responsible for the promulgation and administration of BOP Program Statement policies.

34. BOP Program Statement P6010.02, Health Services Administration, signed by Defendant LAPPIN on January 15, 2005, governs the structure and administration of Health Services for inmates within the custody and control of the BOP.

35. BOP Program Statement P6031.01, Patient Care, signed by Defendant LAPPIN on January 15, 2005, outlines the detailed policies regarding inmate health care within the BOP, including the policy regarding GID treatment.

36. Program Statement P6010.02(5) delegates authority for the care and treatment of federal prisoners within the custody and control of the BOP to the Assistant Director, Health Services Division (HSD). Defendant KENDIG has been the Assistant Director, HSD since 2006.

37. Program Statement P6010.02(5)(a) subsection 1 delegates the "clinical direction and administration of all activities related to the physical and psychiatric care of inmates to the Medical Director. The Medical Director is the final health care authority for all clinical issues." Defendant KENDIG has been the Medical Director since 1999.

38. BOP relies on Program Statement P6031.01(30) to deny all inmates under its care any individualized medical assessment and appropriate care and treatment for GID.

39. BOP Program Statement P6031.01(30) excludes Ms. Adams from treatment for GID, without regard to her serious, individual medical needs, without regard to her history of suicidality and genital self-harm, and without regard to the serious future suicide risk she poses. Due to Defendants' ongoing deliberate indifference to her serious medical need, Ms. Adams continues to suffer severe emotional harm and remains at risk for additional emotional and physical harm.

## MS. ADAMS HAS REPEATEDLY COMMUNICATED TO THE DEFENDANTS THAT SHE HAS GENDER IDENTITY DISORDER AND HAS FREQUENTLY REQUESTED APPROPRIATE MEDICAL TREATMENT

40. Ms. Adams was born in Greenville, Illinois in 1970. Throughout her life, Ms. Adams has believed she was assigned the wrong gender.

41. As a child, Ms. Adams felt more comfortable with girls and played games in which she would dress-up as a girl.

42. As a young teen, Ms. Adams became aware of her female gender identity, realized that she was a female inside a male body and began privately presenting as female.

43. Ms. Adams was terrified of telling her family that she felt "female" because she was afraid that they would reject her.

**44.**  When she was 16 years old, Ms. Adams first told someone that she felt "female," and began researching methods of transition.

**45.**  During her late teens and twenties, Ms. Adams desperately wanted to present as a female publically, but she was unable to do so because of financial restrictions, the social obligations of her conservative church and workplace (Ms. Adams worked in information management at a law firm), and because of family pressure to act "normal".

**46.**  After becoming incarcerated at age 29, Ms. Adams participated in therapy groups that helped her understand that the source of her self-destructive behavior is the distress and turmoil she has been experiencing her whole life because of her untreated GID.

**47.**  During her incarceration, she has repeatedly communicated to the BOP, both verbally and through her actions, that she identifies as a female and has Gender Identity Disorder. She has repeatedly made written and verbal requests for treatment for her condition. Examples of Ms. Adams' communications include, but are not limited to, the following:

   a.   By no later than February 2005, Ms. Adams requested that the BOP place her on female hormones to assist with her transition.

   b.   On July 15, 2005, a BOP employee found Ms. Adams "standing in a pool of blood" because she had tried to cut her testicles off with a razor, stating, "these things [her testicles] are driving me nuts... Nobody knows what it is like to be in the wrong body. Can't you just finish it." Ms. Adams' gaping wound in her scrotal sac required seven staples to repair.

   c.   On August 4, 2005, Dr. James Fletcher, staff psychiatrist at FMC Devens, stated that Ms. Adams, "has been very persistent and requested on numerous times through various avenues that hebe considered for gender reassignment therapy, namely estrogen... He has been disappointed to find out that the Bureau of Prisons policy is rather rigid in this regard[ ] …" and that she "was not a candidate."

   d.   On November 3, 2005, Dr. Fletcher noted Ms. Adams' "unrequited wish to engage in gender reassignment hormonal therapy."

  e. On March 28, 2006, the BOP's staff psychologist stated that Ms. Adams "complained of attempting to get hormone therapy for his gender transformation, but has so far been refused by the BOP."

  f. In August 2006, Ms. Adams told medical staff treating her that, "I have all these parts I don't need," asked them to cut her penis off for her, and requested hormone therapy.

  g. On August 15, 2006, Ms. Adams attempted to sever her penis with a razorblade.

  h. On September 20, 2006, Ms. Adams requested progressive hormone treatments for her gender identity disorder.

  i. On or about May 23, 2007, Ms. Adams wrote to Dr. Ivan Negron, Clinical Director of FCC Coleman, noting "a pattern of no one responding to my please (sic) for hormone treatment" and again requesting hormone treatments.

  j. On December 16, 2007, the warden of FCC Coleman responded to Ms. Adams' complaint that she had not received treatment for her Gender Identity Disorder, refusing to provide her with treatment.

  k. On January 20, 2009, the warden of USMCFP Springfield responded to Ms. Adams' requests for treatment of her Gender Identity Disorder, refusing to provide her with treatment.

  l. On February 8, 2009, Ms. Adams severed her penis with a razor.

## DEFENDANTS HAVE BEEN AWARE OF MS. ADAMS' GENDER IDENTITY DISORDER SINCE AT LEAST 2005 AND HAVE FAILED AND REFUSED TO ADEQUATELY TREAT HER GID CONDITION

48. BOP knew that Ms. Adams had gender identity issues as early as May 2004.

49. Ms. Adams' treating psychologist at USMCFP Springfield formally diagnosed her with Gender Identity Disorder in approximately February 2005.

50. Defendants knew Ms. Adams had a serious medical condition and was at high risk of self harm, as demonstrated by her medical files, requests for treatment, and actions of self-harm, but they have responded with denials of

9

treatment and deliberate indifference. These records demonstrating Defendants' knowledge and inadequate responses include, but are not limited to, the following:

    a.    On February 8, 2005, at USMCFP Springfield, Ms. Adams attempted to hang herself in her cell. Defendant BOP did not provide Ms. Adams with treatment following this suicide attempt. Instead, in a particularly callous response, BOP charged her with Destruction of Government Property for breaking the sprinkler head that failed to support her weight during the suicide attempt, and assessed a fine of $50.00 against her.

    b.    In a report from an individual therapy session, dated June 28, 2005, the BOP's staff psychologist stated that what Ms. Adams "really wants is alternatives to mutilating his genitals and ways to develop a more female appearance..."

    c.    In a review dated July 1, 2005, the BOP's staff psychologist stated that Ms. Adams "sometimes thinks about cutting off his penis to make himself more female and to stop the male hormones from being produced in his body."

    d.    In an evaluation report dated July 15, 2005, discussing Ms. Adams' attempted self-castration, the BOP's staff psychologist stated that Ms. Adams "appears somewhat desperate to find a way to either get female hormones or to complete the process he attempted today. I believe he will attempt again at some point before his sentence ends. … [H]is Gender Identity Disorder will continue and his desire to be female will not remit. Therefore, he will continue to be at risk for this type of behavior."

    e.    Following Ms. Adams' first attempt at self-castration, Defendants still did not provide her treatment. Instead Ms. Adams was disciplined for 30 days for "Tattooing or Self-Mutilation" for attempting to cut off her testicles.

    f.    In a transfer request dated on July 20, 2005, the BOP's staff psychologist stated that Ms. Adams' "has a history of suicide attempts while in BOP custody, largely related to his Gender Identity Disorder" and noted that, "He has sought female hormones while at this facility and been denied."

    g.    On August 7, 2005, a charge nurse at FMC Devens explained to Ms. Adams that "[hormone treatment] is not going to happen unless you

were already on hormones before coming to prison." The same author noted that Ms. Adams was at a "high risk for self mutilation."

h. On August 11, 2005, Dr. Fletcher stated that Ms. Adams is "convinced, as of the last couple of years, that he is a female trapped in a man's body."

i. On September 7, 2005, Dr. Fletcher noted that Ms. Adams was "still ruminating about how to access female hormones as an alternative to autocastration."

j. On September 8, 2005, Dr. Fletcher stated that Ms. Adams "has some delusional ideas about what it might be like to be hormonally altered... He has tried to emasculate himself, or at least castrate himself, on one occasion, a feeble attempt, but feels that he does not like his testicles and wishes that we would surgically remove them if we [the BOP] won't give him hormones..."

k. On April 15, 2006, a BOP staff psychologist documented that Ms. Adams attempted to sever her penis that same day, quoting Ms. Adams as saying she "had been trying to get on hormones" and asked medical staff to "finish the job" inferring that she wanted the medical staff to completely sever her penis. The staff psychologist noted that "Adams' self-inflicted wounds to his penis today appear to be a result of the co-existing diagnosis of Gender Identity Disorder. Specifically, a preoccupation with getting rid of primary or secondary sexual characteristics."

l. In an evaluation on August 16, 2006, the BOP's staff psychologist noted that Ms. Adams stated she was "continuing to plan on ways to amputate his penis, with a focus on how he could complete it in light of the amount of pain he experienced when he cut himself yesterday."

m. On February 8, 2009, Ms. Adams severed her own penis.

51. Upon intake at the inpatient mental health unit at FMC Devens on August 5, 2005, BOP psychiatrist Dr. James Fletcher performed a diagnostic assessment of Ms. Adams and further confirmed that she suffers from GID. Dr. Fletcher also denied Ms. Adams treatment for GID, despite her multiple suicide attempts and despite specifically noting her still-healing wound on her scrotum from her attempted self-castration just two weeks prior.

52. Upon admission, while Dr. Fletcher informed Ms. Adams that pursuant to BOP policy, she was not eligible for hormone therapy he gave her a copy of the WPATH *Standards of Care* which provide the professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders - and which also provide for the very care Defendants were and continue to deny her.

53. Dr. Fletcher informed Ms. Adams that Defendant BOP would not initiate hormone therapy for her under any circumstances, and that he would not provide GID-specific mental health treatment.

54. Since 2005, Ms. Adams has made at least 19 requests to BOP officials at multiple levels, including the Administrator of National Inmate Appeals, as well as chief psychiatrists, chief physicians, wardens, and treating psychologists in four different BOP facilities asking for medical treatment, including hormone treatment, for GID, but Defendants have repeatedly denied her treatment, although Defendants knew that Ms. Adams, as a person with GID, had a heightened risk of suicide and genital self-mutilation if left untreated.

55. During her inpatient stay at FMC Devens, Ms. Adams requested evaluation and treatment for GID both in writing and during psychiatric sessions no fewer than ten times. Each time, Dr. Fletcher denied appropriate medical treatment because Ms. Adams did not meet BOP policy criteria – specifically, she had not been treated for GID prior to incarceration.

56. In denying her treatment, Defendants rely on a BOP policy which prevents persons with GID from receiving hormone therapy if that course of treatment had not commenced prior to incarceration.

57. Despite the BOP's GID diagnosis and Ms. Adams' numerous requests for GID treatment, starting with requests to be placed on female hormones in February 2005, the BOP has refused to provide medical treatment. This denial exacerbated Ms. Adams' GID condition and caused her overall health to further deteriorate.

58. Although Defendants knew that persons with untreated GID have heightened suicide risk and risk of further genital self-mutilation, and that Ms. Adams had a history of suicide attempts, Defendants denied Ms. Adams adequate medical care to treat her condition.

## DEFENDANTS CONTINUE TO DENY MS. ADAMS TREATMENT FOR GID, IGNORING HER SERIOUS MEDICAL NEEDS, BASED ON BOP POLICY

59. Ms. Adams' BOP medical, mental health, and inmate records consistently include references to Dr. Fletcher's 2005 report diagnosing Ms. Adams with GID but denying her treatment because of BOP's policy.

60. After her transfer to USP Beaumont, Defendants repeatedly denied Ms. Adams' requests for treatment based on both Defendant BOP's policy, and the fact that FMC Devens had established the precedent of denying Ms. Adams appropriate medical treatment.

61. While at USP-I Coleman, Ms. Adams requested treatment for GID, as well as access to mental health and other support services, in writing, on at least five occasions.

62. Each of these requests was formally denied for the reasons stated above and each denial references Dr. Fletcher's report from 2005 stating Ms. Adams is not a candidate for gender reassignment treatment because of BOP's policy.

63. As recently as January 20, 2009, Defendant BOP denied Ms. Adams' request for treatment for her GID, citing Dr. Fletcher's 2005 report citing the BOP's policy.

**64.** On information and belief, Defendants have not evaluated Ms. Adams to ascertain her current condition and treatment needs relating to her GID since Dr. Fletcher's 2005 diagnostic report.

**65.** Despite her history of serious self-harm and affirmative diagnosis of GID, a serious medical condition recognized by the medical and psychological communities, Defendants have consistently refused to provide - and continue to refuse to provide - Ms. Adams medical care to treat her GID.

**66.** Even after Ms. Adams' attempts at self-castration and succesful amputation of her penis, Defendants continue to refuse to treat her for her GID symptoms, including failing to provide her with female hormones.

**67.** She is currently housed at USMCP Springfield, an institution where officials are openly hostile to her because of her gender identity.

**68.** As a result of Defendants' indifference, Ms. Adams continues to suffer emotionally and physically because of her Gender Identity Disorder.

**COUNT I:  DEFENDANTS BOP, LAPPIN, AND KENDIG'S FAILURE AND REFUSAL TO PROVIDE CARE AND TREATMENT FOR MS. ADAMS' GID CONDITION VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

**69.** Plaintiff Adams restates and realleges paragraphs 1-68 as if fully set forth in this Count I.

**70.** Defendants have been deliberately indifferent to Ms. Adams serious medical needs by failing to provide her with medical care for her GID.  Defendants have not developed or implemented a treatment plan to treat her GID and they have not provided her with any medical care for GID.

**71.** By their policies, practices, acts and omissions, Defendants violate Ms. Adams right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

**72.** As a matter of policy and practice, Defendants have refused, and continue to refuse, to provide appropriate medical treatment to Ms. Adams who has been diagnosed with a serious medical condition which has severe physical and emotional consequences.

73. To the extent that the failure and refusal of Defendants to provide adequate treatment rests on BOP Program Statement P6031.01(3), that policy is unconstitutional on its face and as applied to Ms. Adams as set forth more fully below in Counts II and III.

## COUNT II: DEFENDANTS BOP, LAPPIN, AND KENDIG'S PROMULGATION AND ENFORCEMENT OF BOP PROGRAM STATEMENT P6031.01(30)) VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION ON ITS FACE

74. Plaintiff Adams restates and realleges paragraphs 1-68 as if fully set forth in this Count II.

75. By their policies, practices, acts and omissions, Defendants violate the rights of inmates with GID to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

76. As a matter of policy and practice, Defendants have refused, and continue to refuse, to provide appropriate medical treatment to inmates who have been diagnosed with GID.

77. Defendants have long been aware of the consequences of failing to provide medically appropriate treatment for inmates with GID by way of accepted medical literature, advocacy organizations, prisoner grievances and other means, but have failed to take reasonable corrective action.

78. Defendants LAPPIN and KENDIG are ultimately responsible, under BOP policy, for the physical and psychiatric care of all federal prisoners within the BOP.

79. By refusing to provide appropriate medical treatment for GID, Defendants have acted, and continue to act, with deliberate indifference to the serious medical needs of, and the substantial risk of serious harm to, prisoners with GID.

## COUNT III: DEFENDANTS BOP, LAPPIN, AND KENDIG'S PROMULGATION AND ENFORCEMENT OF BOP PROGRAM STATEMENT P6031.01(30)) VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS APPLIED TO PLAINTIFF ADAMS

80. Plaintiff Adams restates and realleges paragraphs 1-68 as if fully set forth in this Count III.

81. BOP diagnosed Plaintiff with GID in 2005. At the time of her diagnosis, and at all times thereafter, Defendants were aware of the medically appropriate treatments for GID.

82. Despite this knowledge, BOP has refused, and continues to refuse, to provide Plaintiff with treatment for her GID.

83. Plaintiff has a history of serious suicide attempts and other self-harm while in BOP custody, including serious attempts to cut off her genitalia. These attempts have been diagnosed as being related, both directly and indirectly, to her untreated GID.

84. Defendants have applied Program Statement P6031.01(30) to Plaintiff, and in so doing have refused to allow her any access to medical or psychological treatment for her GID.

85. By their policies, practices, acts and omissions, Defendants violate the rights of Ms. Adams to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

86. Defendants have long been aware of the consequences of failing to provide medically appropriate treatment for Ms. Adams by way of accepted medical literature, advocacy organizations, her own grievances, and other means, but have failed to take reasonable corrective action.

87. By refusing to provide Ms. Adams medical treatment for GID, Defendants have acted, and continue to act, with deliberate indifference to the serious medical needs of, and the substantial risk of serious harm to, Ms. Adams.

**PRAYER FOR RELIEF**

Plaintiff has suffered and will continue to suffer immediate and irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless she is provided with medically appropriate treatment for her GID. The declaratory and injunctive relief sought by Plaintiff is necessary to prevent continued and further injury.

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

A. Enjoin Defendants BOP, LAPPIN, and KENDIG from continuing to enforce the current BOP policy toward the treatment of incarcerated persons with Gender Identity Disorder;

B. Enjoin Defendant BOP to provide Ms. Adams with appropriate GID treatment by medical and mental health professionals with expertise in Gender Identity Disorder, including GID specific psychological treatment, hormone therapy, and other medical treatments deemed appropriate by medical professionals with experience in the treatment of GID;

C. Issue a permanent injunction against Defendants BOP, LAPPIN, and KENDIG from subjecting Plaintiff to the unconstitutional and illegal policies, acts, practices and omissions described in this Complaint;

D. Issue a judgment against Defendants BOP, LAPPIN, and KENDIG declaring that the policies, acts, practices and omissions of these Defendants with regard to prisoners with GID are unlawful and constitute cruel and unusual punishment in violation of the Eighth Amendments to the United States Constitution;

E. Order Defendant BOP, through Defendants LAPPIN and KENDIG, to promulgate a formal policy stating that prisoners with GID shall have access to medically appropriate treatment, including hormone therapy, "real life" experience, and transition surgery, regardless of whether or not they received GID treatment prior to incarceration;

F. Order Defendants BOP, through Defendants LAPPIN and KENDIG to take all other actions necessary to provide medically appropriate treatment for prisoners with GID;

G. Order reasonable attorney fees as well as costs of suit to Plaintiff's attorneys; and

H. Grant such other and further relief as this Court considers just and proper.

Respectfully Submitted,

s/ Jennifer Levi

Jennifer Levi, Esq.
Massachusetts Bar No.  562298
Gay & Lesbian Advocates & Defenders
30 Winter Street, Suite 800
Boston, MA 02108

and

Jody Marksamer, Esq.
California Bar No. 229913
Shannon Minter, Esq.,
California Bar No. 168907
National Center for Lesbian Rights
870 Market Street, Suite 3
Boston, MA 02108
San Francisco, CA 94102

and

Cassandra Capobianco, Esq.
Florida Bar No. 614734
Florida Institutional Legal Services, Inc.
12921 SW 1st Road, Ste. 107, # 346
Newberry, Florida 32669

**CERTIFICATE OF SERVICE**

In accordance with Local Rule 5.2(b), I, Jennifer Levi, hereby certify that this document filed through the ECF system on July 10, 2009 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Jennifer Levi*

Jennifer Levi, Esq.