UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VANESSA ADAMS, legal name,<br>Nicholas Adams,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>FEDERAL BUREAU OF PRISONS, et al.,<br><br>　　　　　　　Defendants. | *<br>*<br>*<br>*<br>*<br>*   Civil Action No. 09-10272-JLT<br>*<br>*<br>*<br>*<br>* |

MEMORANDUM

June 7, 2010

TAURO, J.

I.   Introduction

Plaintiff, an inmate in the custody of the Federal Bureau of Prisons, asserts that Defendants have subjected her[1] to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution by denying her appropriate medical treatment for her diagnosed condition of Gender Identity Disorder. Presently at issue is Defendants' Motion to Dismiss the Amended Complaint [#20]. For the following reasons, Defendants' Motion to Dismiss the Amended Complaint [#20] is DENIED.

II.   Background[2]

---

[1]Though Plaintiff is biologically a male, this court refers to Plaintiff using female pronouns out of deference to her self-identification as such.

[2]Where Defendants challenge the existence of the Court's subject matter jurisdiction on mootness grounds, the court will construe the allegations of the Complaint in Plaintiff's favor, Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), but may also look beyond the pleadings, to

Plaintiff came into the custody of the Federal Bureau of Prisons ("BOP") in 1999 at age 29. Though Plaintiff is biologically a male, she has self-identified as a female throughout her adult life. Because of this, she wanted to initiate the gender transition process prior to her incarceration, but found herself unable to do so in the face of the restrictions imposed on her by a conservative family and workplace.

BOP formally diagnosed Plaintiff with Gender Identity Disorder ("GID") in February 2005. GID is a readily diagnosable and treatable mental illness with an established course of treatment, consisting primarily of three components. This course of treatment is commonly referred to as "triadic therapy" and includes: (1) hormones of the desired gender; (2) the "real-life experience," i.e. living full-time in the new gender, and (3) surgery to change the sex characteristics of the person suffering from GID. Individuals suffering from GID who do not receive appropriate medical treatment are at risk of serious harm including depression, anxiety, self-mutilation and suicide.

After her 2005 diagnosis, Plaintiff requested that BOP treat her with female hormones in order to assist her in her transition from male to female, but BOP denied her request. As a result, on February 8, 2005, Plaintiff attempted to hang herself in her cell at USMCFP Springfield. Thereafter, BOP's staff psychologist observed that what Plaintiff "really wants is alternatives to mutilating [her] genitals and ways to develop a more female appearance...,"[3] and that Plaintiff

---

affidavits and depositions, in order to determine whether it may properly hear Plaintiff's claims. NEGB, LLC v. Weinstein Co. Holdings, 490 F. Supp. 2d 89, 92 (D. Mass. 2007). This court presents the relevant facts as they are alleged in the Amended Complaint, except where specifically noted otherwise.

[3]Amended Compl. ¶ 50.

"sometimes thinks about cutting off [her] penis to make [herself] more female and to stop the male hormones from being produced in [her] body."[4] Despite this warning from the staff psychologist that Plaintiff presented a real risk of self-mutilation, BOP did not provide her with treatment for her GID. And two weeks later, Plaintiff did in fact try to cut her testicles off using a razor. Plaintiff's wound required seven staples to repair.

In discussing this attempt at self-castration, the BOP staff psychologist stated that Plaintiff "appears somewhat desperate to find a way to either get female hormones or to complete the process [she] attempted today. I believe [she] will attempt again at some point before [her] sentence ends. ... [Her] Gender Identity Disorder will continue and [her] desire to be female will not remit. Therefore, [she] will continue to be at risk for this type of behavior."[5] BOP, however, still did not provide Plaintiff with treatment. Rather, BOP punished Plaintiff for violating the prison's prohibition against "self-mutilation."

On July 20, 2005, BOP's staff psychologist submitted a request to transfer Plaintiff from Springfield to FMC Devens in Massachusetts, based on her history of suicide attempts and self-mutilation stemming from BOP's ongoing refusal to treat her GID. Upon intake at the inpatient mental health unit at Devens, BOP psychiatrist Dr. James Fletcher performed a diagnostic assessment of Plaintiff, which confirmed that she suffers from GID. But Dr. Fletcher informed Plaintiff that BOP would not provide treatment because, pursuant to BOP policy, only those inmates who received hormone therapy prior to incarceration were eligible to receive hormones

---

[4] Id.

[5] Id.

while incarcerated.[6] Dr. Fletcher stated that Plaintiff "has been very persistent and requested on numerous times through various avenues that [she] be considered for gender reassignment therapy, namely estrogen... [She] has been disappointed to find out that the Bureau of Prisons policy is rather rigid in this regard[ ] …"[7] and that she "was not a candidate."[8] A charge nurse at FMC Devens echoed this position, explaining that "[hormone treatment] is not going to happen unless you were already on hormones before coming to prison."[9]

While at Devens, Plaintiff requested evaluation and treatment for GID both in writing and during psychiatric sessions no fewer than ten times. Each time, BOP denied her treatment because she did not meet BOP policy criteria. Specifically, they consistently declared her ineligible for hormone treatment during incarceration because she had not been treated with hormones prior to incarceration.

BOP transferred Plaintiff to USP Beaumont in Texas in March 2006. In August 2006, Plaintiff asked the Beaumont medical staff to cut her penis off for her and requested hormone therapy. Medical staff refused this request and Plaintiff again attempted to sever her penis on August 15, 2006. Subsequently, the BOP psychologist noted that Plaintiff was "continuing to

---

[6]Policy Statement 6031.01 states, "Inmates who have undergone treatment for gender identity disorder will be maintained only at the level of change which existed when they were incarcerated in the Bureau. Such inmates will receive thorough medical and mental health evaluations, including the review of all available outside records. The Medical Director will be consulted prior to continuing or implementing such treatment. The Medical Director must approve, in writing, hormone use for the maintenance of secondary sexual characteristics in writing." Aff. of Patrick C. Gariety, ¶ 4.

[7]Amended Compl. ¶ 47.

[8]Id.

[9]Id. at ¶ 50.

4

plan on ways to amputate h[er] penis…."[10]

In 2007, Plaintiff was transferred to FCC Coleman in Florida. On June 27, 2007, the warden denied Plaintiff's request for treatment based on Dr. Fletcher's determination that she was not a candidate for treatment because she had not received hormones prior to incarceration.[11] Plaintiff's appeal of this decision was denied by the Regional Director for the Southeast Regional Office based on the same BOP policy, which prevented inmates from receiving hormone treatment while incarcerated unless they received hormones prior to incarceration.[12] Plaintiff also appealed this denial. And on December 13, 2007, the Administrator for National Inmate Appeals again denied Plaintiff's request for treatment, concluding that "the Agency will not initiate medical or surgical intervention" for a GID diagnosis.[13]

On January 20, 2009, just days before the initiation of this action, BOP again denied Plaintiff's request for treatment. And three weeks later, Plaintiff finally succeeded in severing her penis with a razor. Despite Plaintiff's self-mutilation and the pendency of this litigation, BOP still provided Plaintiff with no treatment for GID for the next six months.

Plaintiff was transferred to USMCFP Springfield in Missouri in March 2009, where she again requested hormone treatment. On August 14, 2009, Plaintiff filed, and this court allowed, an emergency motion seeking an order allowing Plaintiff's outside expert, Dr. Randi Ettner, to

---

[10] Id.

[11] Decl. of Cheryl Magnusson, Ex. B, FCC Coleman, BP-9 Response, Case Number: 455962-F1.

[12] Id., Ex. D, Regional Administrative Remedy Appeal No. 455962-R2, Part B-Response.

[13] Id., Ex. E, Administrative Remedy Number 455962-A1, Part B-Response.

perform an psychological evaluation of her. BOP finally initiated hormone treatment for Plaintiff on the very same day.

Based on the foregoing facts, Plaintiff's Amended Complaint alleges that BOP has acted with deliberate indifference in violation of the Eighth Amendment by refusing to adequately treat her GID. Plaintiff additionally asserts that the policy upon which BOP consistently relied in denying treatment is unconstitutional on its face and as applied to her.

III.    Discussion

   A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants contend that this court is without subject matter jurisdiction to hear the current action because, by voluntarily providing hormone therapy to Plaintiff as of August 14, 2009, Defendants have rendered her claims moot. This court disagrees.

Pursuant to Article III of the United States Constitution, federal courts have the power to "adjudicate only actual, ongoing cases or controversies."[14] This constitutional limitation on the jurisdiction of the federal courts is expressed, at the outset of a case, through the requirement that Plaintiff have standing to commence the litigation. Thus, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."[15] The injury must be both "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical."[16]

---

[14] Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990).

[15] Id.

[16] Katin v. National Real Estate Info. Services, Inc., 2009 WL 929554, * 3 (D. Mass. 2009)

The "case-or-controversy requirement subsists through all stages of federal judicial proceedings,"[17] however, and the "requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."[18] So even where the Plaintiff initially presents a viable claim, "a federal court is duty bound to dismiss [her] claim as moot if subsequent events unfold in a manner that undermines any one of the three pillars on which constitutional standing rests: injury in fact, causation, and redressability."[19]

Nonetheless, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways."[20] Accordingly, the standard set forth by the Supreme Court for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent.... [A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur."[21] Importantly, a statement by Defendants that the challenged conduct will not recur, standing alone, cannot

---

[17] Ramirez v. Sanchez Ramos, 438 F.3d 92, 100 (1st Cir. 2006) ("Article III considerations require that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (internal quotation and citation omitted).

[18] Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (internal quotations omitted).

[19] Ramirez, 438 F.3d at 100.

[20] Friends of the Earth, 528 U.S. at 189.

[21] Id. (citing United States v. Concentrated Phosphate Export Assn., Inc., 393 U.S. 199, 203 (1968)) (emphasis added).

suffice to satisfy this heavy burden of persuasion.[22]  And, certainly, "where a defendant is unwilling to give any assurance that the conduct will not be repeated, a natural suspicion is provoked that recurrence may well be a realistic possibility."[23]

The "need for protection against continued self-mutilation [because of Gender Identity Disorder] constitutes a serious medical need to which prison officials may not be deliberately indifferent."[24]  Plaintiff consistently requested hormone therapy beginning in 2005 when she received a diagnosis of GID from BOP medical staff.  Defendants, however, steadfastly denied Plaintiff hormone therapy over the course of more than four years, even in the face Plaintiff's attempted and successful self-castration.  They provided treatment to her only after she had commenced this lawsuit and filed an emergency motion seeking medical evaluation by an outside expert.  In fact, the day that Defendants made hormone therapy available to Plaintiff was the *very same day* that this court allowed Plaintiff's emergency motion.  Yet, Defendants now ask this court to dismiss this action as moot based on the fact that they have voluntarily ceased the deprivation of medical treatment challenged in Plaintiff's Complaint.

Notably, Defendants do *not* argue that the challenged deprivation of hormone therapy is not reasonably likely to recur, but instead state only that "Plaintiff's medical and psychological

---

[22] See Concentrated Phosphate Export Assn., 393 U.S. at 203.

[23] Adams v. Bowater, Inc., 313 F.3d 611, 615 (1st Cir. 2002).

[24] De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003); see also Kosilek v. Maloney, 221 F.Supp.2d 156, 184 (D. Mass 2002) (finding that gender identity disorder constitutes a serious medical need necessary to implicate the protections of the Eighth Amendment where the Plaintiff had engaged in self-mutilation).

8

progress will continue to be monitored on a regular basis,"[25] in accordance with the Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders.

Moreover, Defendants have not disavowed the policy they relied on for four years in support of their claim that Plaintiff was ineligible for hormone therapy because she was not receiving it at the time of her incarceration. Indeed, Defendants defend the policy and, for the purposes of litigation, take the position that the policy *does* allow the Medical Director to implement hormone treatment to those inmates who have not undergone such treatment prior to incarceration. Defendants take this position notwithstanding the fact that they found Plaintiff to be ineligible to receive hormones precisely because, prior to this lawsuit, they consistently interpreted this policy to prohibit inmates, who had not received hormone treatment before incarceration, from receiving hormone therapy while incarcerated.[26] And where, as here, Defendants continue to vigorously defend the policy that they relied on in denying treatment in the first place, "recurrence [of the challenged conduct] is certainly more than a theoretical possibility."[27]

On such a record, this court cannot conclude that Defendants have satisfied "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not

---

[25] Aff. of Patrick C. Gariety, ¶ 9.

[26] See Decl. of Cheryl Magnusson, Ex. D, Regional Administrative Remedy Appeal No. 455962-R2, Response.

[27] Adams, 313 F.3d at 615.

reasonably be expected to recur."[28] If this court were to dismiss Plaintiff's claims at this juncture, based on nothing more than Defendants voluntary cessation of the challenged conduct, without even so much as an assurance from Defendants that the challenged conduct will not recur, it would "leave the defendant[s] . . . free to return to [their] old ways."[29] And contrary to Defendants' assertions, mootness doctrine does not condone, much less mandate, such an outcome.

      B.    <u>Motion to Dismiss or Transfer Based on Improper Venue</u>

Defendants next argue that this court is not a proper venue in which to hear Plaintiff's lawsuit and, therefore, they seek dismissal pursuant to Fed. R. Civ. P. 12(b)(3).

The applicable venue provision provides that, in a civil action against an employee or agency of the United States, venue is proper in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or (3) the plaintiff resides, if no real property is involved in the action.[30] Because neither Plaintiff nor Defendants reside in Massachusetts, venue is only proper in this district if Plaintiff can demonstrate that a substantial part of the events giving rise to Plaintiff's claims took place here.

In order to determine whether Massachusetts is a judicial district in which a substantial part of the events occurred, this court must look "not to a single 'triggering event' prompting the

---

[28]<u>Id.</u> (quoting <u>United States v. Concentrated Phosphate Export Assn., Inc.</u>, 393 U.S. 199, 203 (1968)).

[29]<u>Friends of the Earth</u>, 528 U.S. at 189.

[30]28 U.S.C. § 1391(e).

action, but to the entire sequence of events underlying the claim."[31]  In so doing, the court does "not focus on the actions of one party.  Rather, [the court's] approach takes 'a holistic view of the acts underlying a claim.'"[32]

Where the events giving rise to a claim have taken place in multiple locations, as is the case here, venue may be proper in more than one district.  Under such circumstances, the court is "not required to determine the best venue, merely a proper one."[33]  In other words, the question before this court is whether the district that Plaintiff chose had a substantial connection to the claim, even though other forums may have had a greater connection.[34]  And importantly, when more than one proper venue exists, "there is a strong presumption in favor of the plaintiff's choice of forum."[35]

In support of their contention that Massachusetts is an improper venue, Defendants state that the "*only* nexus linking [Plaintiff's] claims to this judicial district is the fact that [Plaintiff] was incarcerated at FMC-Devens for eight months ending in March 2006, and that she was denied hormone therapy during that time.  Since then, however, [Plaintiff] has been incarcerated in several federal penitentiaries, and personnel at FMC Devens have had little or no input on her

---

[31]Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 12 (1st Cir. 2009) (quoting Uffner v. La Reunion Francaise, S.A. 244 F.3d 38, 42 (1st Cir. 2001)).

[32]Id. (quoting Uffner, 244 F.3d at 43 n.6).

[33]Id. (internal citation omitted).

[34]Setco Enters., Corp. v. Robbins, 19 F.3d 1278, 1281 (8th Cir. 1993).

[35]Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000).

medical treatment."[36] In essence, Defendants appear to argue that, though Massachusetts has a connection to this action, other judicial districts have *more substantial* connections. But as this court noted above, the relevant question is not whether another district may have had a *more* substantial connection to the claims, but whether a substantial part of the events giving rise to the claims occurred in *this* district. And Defendants cannot minimize the import of this action's connections to Massachusetts, simply by pointing out that other events, perhaps more substantial, have since occurred in different districts.

Plaintiff alleges that the following events demonstrate a connection between her claims and this district: BOP transferred Plaintiff to FMC Devens in Massachusetts because she had a history of suicide and self-mutilation attempts that stemmed from her untreated GID; BOP officials at FMC Devens denied her hormone therapy on multiple occasions while she was incarcerated there; FMC Devens' psychiatrist, Dr. Fletcher, issued a report declaring Plaintiff ineligible for hormone therapy during incarceration because she had not received hormone treatment prior to incarceration; and other BOP officials have since cited Dr. Fletcher's report as a basis for a number of subsequent denials of hormone treatment.

In light of the foregoing, this court is convinced that the events alleged to have occurred in Massachusetts, together, constitute a substantial and consequential portion of the factual predicate giving rise to Plaintiff's claims. And the fact that there may be other judicial districts with greater connections to this action cannot suffice to overcome the strong presumption in favor of maintaining this lawsuit in Plaintiff's original choice of forum. Accordingly, this court must conclude that venue in this judicial district is proper.

---

[36]Def.'s Mem. Supp. Mot. Dismiss, 8.

As an alternative to dismissal, Defendants seek a transfer of venue, pursuant to 28 U.S.C. § 1406, to the Western District of Missouri.  When a plaintiff has filed an action in an improper venue, 28 U.S.C. § 1406 permits the district court to dismiss the action *or*, in the interest of justice, to transfer the action to a proper venue, so that it may proceed.  Because this court has found that Plaintiff properly laid venue in Massachusetts, there is no basis upon which to effect a transfer of this action to another judicial district under § 1406.[37]

IV.     Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint [#20] is DENIED.

AN ORDER HAS ISSUED.

       /s/ Joseph L. Tauro  
       United States District Judge

---

[37]This court surmises from the two cases Defendants cite in support of their Motion to Transfer that they may actually be attempting to ask for a discretionary transfer from one proper venue to another, pursuant to 28 U.S.C. § 1404, based on the convenience of the parties and witnesses.  At the outset, it is worth noting that this court doubts whether such a discretionary transfer would be warranted, given that (1) a substantial portion of the events giving rise to this action occurred in Massachusetts and (2) there is no reason to believe that Plaintiff will continue to be incarcerated in Missouri, as she has been transferred at least four times in the past five years.  Nonetheless, Defendants have not moved for such a discretionary transfer and, therefore, that issue is not properly before this court.